**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,　　:

　　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　Plaintiff,　　　:

　　　　　　　　　　　　　　　　　　　　　　:

　　　-against-　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　　:　　13 Civ. 1080 (JSR)

MICHEL TERPINS and　　　　　　　　　　　:

RODRIGO TERPINS,　　　　　　　　　　　　:　　ECF CASE

　　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　　　　Defendants,　　　:

　　　　　　　　-and-　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　　:

ALPINE SWIFT LTD.　　　　　　　　　　　　:

　　　　　　　　　　　Relief Defendant.　　:
-----------------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN RESPONSE TO THE COURT'S REQUEST FOR AN EVIDENTIARY SUBMISSION

Sanjay Wadhwa
David S. Brown
Megan M. Bergstrom
Charles D. Riely


Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
200 Vesey Street
New York, NY  10281

January 30, 2014

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

I.   PROCEDURAL BACKGROUND ............................................................................. 2

    A.  Complaint and Order Freezing Assets ............................................................. 2

    B.  Asset Freeze Pending Final Disposition of the Action .................................... 2

    C.  Events Following Entry of Asset Freeze .......................................................... 3

    D.  Proposed Consent Judgments .......................................................................... 4

II.  EVIDENCE SUPPORTING THE COMMISSION'S CLAIMS ........................................ 5

    A.  Information about the Heinz Acquisition was Material Nonpublic Information ........... 6

    B.  Suspicious Circumstances Surrounding the Purchases of Heinz Call Options ............. 6

III. DISCUSSION .......................................................................................................... 8

    A. The Proposed Consent Judgments are Fair, Adequate, Reasonable, and In the Public Interest ................................................................................................. 8

    B. The Evidence Adduced Provides Additional Support for the Proposed Settlements .... 10

CONCLUSION ................................................................................................................. 12

# TABLE OF AUTHORITIES

## CASES

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)............................................................................. 1

*Dirks v. SEC*,
   463 U.S. 646 (1983) ................................................................................... 11

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ..................................................................................... 9

*SEC v. Adler*,
   137 F.3d 1325 (11th Cir. 1998) ................................................................. 11

*SEC v. Bank of America*,
   No. 09-6829 (JSR), Dkt. 97, 99 (S.D.N.Y. Mar. 2, 2010) ........................... 1

*SEC v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998)........................................................................ 4

*SEC v. Citigroup Global Markets Inc.*,
   673 F.3d 158 (2d Cir. 2012)........................................................................ 9

*SEC v. Citigroup, Inc.*,
   No 10-1277, Dkt. 16 (D.D.C. Sept. 8, 2010) ............................................. 1

*SEC v. Heider*,
   1990 WL 200673 (S.D.N.Y. Dec. 4, 1990) .............................................. 11

*SEC v. Koss*,
   No. 11-991, Dkt. 6 (E.D. Wisc. Jan. 24, 2012) .......................................... 1

*SEC v. Mayhew*,
   121 F.3d 44 (2d Cir. 1997).......................................................................... 12

*SEC v. Musella*,
   748 F. Supp. 1028 (S.D.N.Y. 1989).......................................................... 12

*SEC v. Randolph*,
   736 F.2d 525 (9th Cir. 1984) ...................................................................... 9

*SEC v. Roszak*,
   495 F. Supp. 2d 875 (N.D. Ill. 2007) ...................................................... 11

*SEC v. Scoppetoulo,*
    2011 WL 294443 (S.D. Fla. Jan. 27, 2011) ............................................................ 11

*SEC v. Singer,*
    786 F. Supp. 1158 (S.D.N.Y. 1992) ...................................................................... 11

*SEC v. Wang,*
    944 F.2d 80 (2d Cir. 1991) ................................................................................. 9

*SEC v. Warde,*
    151 F.3d 42 (2d Cir. 1998) ............................................................................... 12

*Smith v. SEC,*
    653 F.3d 121 (2d Cir. 2011) ............................................................................... 4

*United States v. Cannons Eng'g Corp.,*
    899 F.2d 79 (1st Cir. 1990) ................................................................................. 9

## FEDERAL STATUTES

Section 10(b)
    [15 U.S.C. § 78j(b)] ......................................................................... 3, 4, 5, 10, 11

Section 21A(a)(2)
    [15 U.S.C. § 78u-1(a)(2)] ................................................................................. 10

## FEDERAL REGULATIONS

Rule 10b-5
    [17 C.F.R. § 240.10b-5] ................................................................... 3, 4, 5, 10, 11

## OTHER AUTHORITIES

Lawrence Collins, *Professor Lowenfeld and the Enforcement of Foreign Public Law,*
    42 N.Y.U. J. Int'l L. & Pol. 125, 125-29 (2009) ....................................................... 10

## INTRODUCTION

The Securities and Exchange Commission ("Commission") respectfully submits this Memorandum in response to the Court's request for an evidentiary submission and in further support of the entry of the proposed consent judgments in this action.[1]  The Commission originally submitted the proposed consent judgments on October 10, 2013 (the "October 10 submission").  As detailed in the October 10 submission, the sanctions embodied in the proposed settlements reasonably reflect the scope of relief the Commission would likely obtain under the applicable law if the Commission was successful in litigation.  The proposed settlements also take into account the risks associated with litigating an action where the defendants, documentary evidence, and third party witnesses are all located outside of the United States.  The proposed consent judgments balance these factors and reflect a fair, adequate, and reasonable resolution of this matter.

To address concerns that the Court outlined in phone conferences with the parties, the Commission is submitting this Memorandum, the supporting Declaration of Megan M. Bergstrom ("Bergstrom Dec."), and an Appendix of Exhibits.  For the reasons outlined in this Memorandum, along with the supporting materials and the October 10 submission, the Commission requests that the Court approve the proposed settlements and enter the consent judgments.

---

[1] It is the Commission's position that an evidentiary submission is not necessarily required as a precondition to the entry of a consent judgment, but the Commission has, in the past, provided information supporting its factual allegations when courts have expressly asked for such information.  *E.g., SEC v. Bank of America*, No. 09-6829 (JSR), Dkt. 97, 99 (S.D.N.Y. Mar. 2, 2010); *SEC v. Citigroup, Inc.*, No 10-1277, Dkt. 16 (D.D.C. Sept. 8, 2010); and *SEC v. Koss*, No. 11-991, Dkt. 6 (E.D. Wisc. Jan. 24, 2012).  Using informational submissions offered in support of proposed consent judgments to determine liability would negate the purposes for which parties reach settlements.  *Cf. Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974).

I.       **PROCEDURAL BACKGROUND**

     A.   **Complaint and Order Freezing Assets**

     The Commission filed this action on February 15, 2013, one day after an announcement that H.J. Heinz Company ("Heinz") had entered into an agreement to be acquired at $72.50 per share by an investment consortium comprised of Berkshire Hathaway and 3G Capital (the "Announcement"). (Docket No. 1.) The complaint alleged that certain unknown traders engaged in insider trading when they placed highly suspicious trades in Heinz call options the day before the Announcement through a brokerage account held at a Swiss affiliate of Goldman Sachs & Co. ("Goldman Sachs"). (Docket No. 1.) To prevent the dissipation of the trading proceeds, the Commission also filed an *ex parte* emergency application along with supporting evidence seeking an asset freeze as to all the assets relating to the suspicious trading. (Docket Nos. 6, 7 & 8.) On February 15, the Court entered an order freezing approximately $1.8 million in trading proceeds held in the United States and ordered the defendants to show cause on February 22, 2013 why the Court should not continue the asset freeze pending a final resolution of the action. (Docket No. 3.)

     B.   **Asset Freeze Pending Final Disposition of the Action**

     After the defendants failed to appear at the February 22 hearing, the Court found that the Commission had produced sufficient evidence to support its application to continue the asset freeze. (Docket No. 9.) At the February 22 hearing, the Court stated that it "did undertake to look carefully at the innumerable exhibits and declaration provided by the SEC" and found the "relief is very well warranted." (Bergstrom Dec., ¶ 2; App. Ex. 1, 2:19-23.) In addition, on February 22, the Court entered an Order Freezing Assets and Prohibiting the Destruction of Records, which provided that "[b]ased on the evidence presented, there is a basis to infer that the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as alleged in

2

the Complaint, and it appears likely that the Commission will prevail on the merits of its claims under such statute and Rule in this action."  (Docket No. 9, p. 2, ¶ 1.)

### C. <u>Events Following Entry of Asset Freeze</u>

Between February and July, 2013, Commission counsel made multiple requests for assistance to the Swiss Financial Market Supervisory Authority ("FINMA") pursuant to the May 2002 IOSCO Multilateral Memorandum of Understanding to determine the identities of the account holder and those involved in the Heinz trades at issue in the complaint.  (Bergstrom Dec., ¶¶ 4-5; App. Ex. 10.)  In July 2013, Commission counsel received documents from FINMA regarding the trading and account owner's identity.  (Bergstrom Dec., ¶ 4; App. Exs. 3-9.)  On July 24, 2013, Commission counsel informed the Court that Alpine Swift Ltd. ("Alpine Swift"), a Cayman Islands limited liability company, held the account through which the trading occurred.  (Bergstrom Dec., ¶ 6; App. Ex. 11.)  Immediately thereafter, the Commission served Alpine Swift with the complaint and received authority from the Court to subpoena phone records relating to the Heinz trade.  (Docket Nos. 19 & 20; July 30, 2013 sealed order.)

Beginning in September 2013, pursuant to the Civil Case Management Plan issued by the Court, the Commission served discovery on third parties such as phone service providers and also served discovery requests on Alpine Swift.  (Docket No. 23.)  Based on voluntary requests for information and formal discovery requests, Commission counsel developed additional evidence regarding the trading at issue in the complaint, and, on October 10, 2013, filed an amended complaint naming Rodrigo Terpins and Michel Terpins as defendants and Alpine Swift as a relief defendant.[2]  (Docket No. 31.)

---

[2] The amended complaint named Alpine Swift as a relief defendant because its role in the trading was limited to the defendants using it as a vehicle for the fraudulent Heinz trading.  Alpine Swift,

### D.  <u>Proposed Consent Judgments</u>

Along with the filing of the amended complaint, the parties submitted proposed consent judgments in which Rodrigo and Michel Terpins consented to the entry of final judgments, without admitting or denying the allegations in the amended complaint, enjoining them from future violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; requiring them, jointly and severally with Alpine Swift, to disgorge their ill-gotten gains; and requiring the Terpins to each pay a civil penalty of $1.5 million.  (Bergstrom Dec., ¶ 12; App. Ex. 16.)  Alpine Swift also consented to a final judgment, without admitting or denying the allegations in the amended complaint, in which it agreed to disgorge the frozen trading proceeds.  (*Id.*)  After the parties submitted the proposed consent judgments, the Court informed the parties on a conference call held on November 15, 2013 that the Court's only concern with the proposed settlement was the inclusion of the no-admit, no-deny ("NAND") language.

After the call, the parties engaged in further negotiations, and, on December 26, 2013, submitted revised proposed consent judgments that did not include the NAND language. (Bergstrom Dec., ¶ 13; App. Ex. 17.)  The consents, however, added a new clause to make clear that the removal of the NAND language should not be construed as an admission.  (*Id.*)  On a December 31 call, the Court informed the parties that it continued to have a concern about the language relating to admissions in the revised consents and presented the parties with three options: (i) removing the new clause from the revised proposed consent judgments; (ii) having

---

as the owner of the account, is not entitled to the proceeds of this trading.  Courts may order equitable relief against an entity who is not accused of wrongdoing in a securities enforcement action where that entity (1) received ill-gotten funds; and (2) does not have a legitimate claim to those funds.  *See SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011).

the settling parties admit to the allegations for the limited purpose of the proceedings at hand; or (iii) having an evidentiary hearing.  In a subsequent call, held on January 9, 2014, the Court ordered the Commission to make an evidentiary submission by January 30 that provided the Court with evidence supporting the Commission's claims.

## II.   <u>EVIDENCE SUPPORTING THE COMMISSION'S CLAIMS</u>

The amended complaint alleges that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  (Docket No. 31.)  Specifically, the amended complaint alleges that Rodrigo Terpins placed an order to purchase out-of-the-money Heinz call options while he was vacationing at Walt Disney World in Orlando, and that the trading was based on material non-public information that he received from his brother Michel Terpins.  (*Id.*) The amended complaint further alleges that the trades were made through an account belonging to a Cayman Islands-based entity named Alpine Swift that holds assets for one of their family members.  (*Id.*)  The Announcement resulted in the value of the Heinz call options Rodrigo Terpins purchased the day before increasing by nearly 2,000% in one day.  (*Id.*)

Documentary evidence supports the allegations in the amended complaint.  The Commission based its allegations on, among other things, the following circumstantial evidence, which supports imposing the remedies set forth in the proposed consent judgments: (i) the historical price and volume data for Heinz stock and call options;[3] (ii) the brokerage records, trade confirmation, and order tickets for the Alpine Swift account held at Goldman Sachs in Switzerland through which the trading occurred (the "Account"); (iii) the notes of a registered representative for the Account; (iv) an email from Rodrigo Terpins to this registered

---

[3] The Commission previously submitted this evidence to the Court as part of its *ex parte* application on February 15, 2013.  (Docket No. 8.)

representative on the day of the trade; (v) correspondence from Goldman Sachs' Swiss affiliate to Alpine Swift; (vi) phone records; (vii) travel history and hotel records; and (viii) a list of participants in the Heinz acquisition.  (Bergstrom Dec., ¶¶ 4 & 7-11; App. Exs. 3-9, 12-15.)

### A.  Information about the Heinz Acquisition was Material Nonpublic Information

As alleged in the amended complaint, the dramatic spike in the price of Heinz's stock after the Announcement demonstrates that news of the acquisition was material nonpublic information.  The deal price of $72.50 per share represented a nearly 20% premium to Heinz's closing price of $60.48 on February 13.  (Docket No. 8, ¶ 2 and Ex. 1.)  In reaction to the Announcement, on February 14, Heinz's stock closed at $72.50 – an increase of $12.05 per share, or nearly 20%, over the previous trading day's closing price of $60.48.  (*Id.* at ¶ 3 and Ex. 2.)  The trading volume in Heinz also skyrocketed on February 14, reaching over 64 million shares, an increase of over 1,700%.  Prior to the Announcement, Heinz's stock had consistently traded at just around or below $60 per share since November 2012.  (*Id.*)

### B.  Suspicious Circumstances Surrounding the Purchases of Heinz Call Options

The circumstantial evidence developed by the Commission about the timing, size, and profitability of the trade alleged in the amended complaint is indicative of insider trading. Rodrigo Terpins placed an order to purchase 2,533 out-of-the money Heinz call options through the Account on February 13, the day before the Announcement.  (Bergstrom Dec., ¶¶ 4,7; App. Exs. 4-5, 8-9, 12.)  Rodrigo Terpins placed the Heinz trade in an account in the name of Alpine Swift rather than placing it in an account held in his own name or the name of his brother, defendant Michel Terpins.  (*Id.*)  The Account had not purchased any call options between January 1, 2012 and the time of the Heinz trade on February 13, 2013.  (Docket No. 8, ¶ 5, Ex. 4;

6

Bergstrom Dec., ¶ 4; App. Ex. 3.)  In fact, the Account engaged in very limited trading activity during this time.  (*Id.*)

The purchase of 2,533 Heinz call options with a strike price of $65 on February 13 was unusual not only in the context of the trading history of the Account, but also in the context of the historical trading of those particular call options.  Defendants' purchase accounted for nearly 98% of the June $65 call options purchased on February 13.  (Docket No. 8, Ex. 3.)  On February 12, only 14 June $65 calls were purchased and on February 11 none were purchased.  In fact, since November 14, 2012, not more than 61 of these contracts had been purchased on any other single day.  (Docket No. 8, Ex. 3.)  As a result of the Announcement, the price of June $65 calls shot up from a close of $0.40 on February 13 to a close of $7.33 on February 14, an increase of over 1,700%.  (*Id.*)  In a matter of one day, the calls in the Account soared in value from $90,000 to approximately $1.8 million.  (Docket No. 8, ¶¶ 5, 9, & Ex. 4.)

The geographic location of the defendants as alleged in the amended complaint also provides further circumstantial evidence of insider trading.  Rodrigo Terpins and Michel Terpins both travelled to Miami, Florida in February 2013.  (Bergstrom Dec., ¶¶ 8-10; App. Exs. 13-14.)  During this time, Heinz, 3G Capital, and Berkshire Hathaway engaged in negotiations about the acquisition.  (Bergstrom Dec. ¶ 3; App. Ex. 2.)  Individuals with knowledge of the acquisition were located in Miami.  (Bergstrom Dec. ¶ 11; App. Ex. 15.)  While he was in the United States in February 2013, Rodrigo Terpins used a pre-paid cell phone held in his name to communicate with a broker at Goldman Sachs' Swiss affiliate, where the Heinz trade was executed.[4] (Bergstrom Dec. ¶¶ 4, 7; App. Ex. 7, 12.)

---

[4] If the Commission were to litigate this matter, it would use discovery to develop additional documentary and testimonial evidence to support its claims.  The Commission commenced this

Rodrigo Terpins was on a family vacation at Walt Disney World on February 13, the day he placed the trade.  (Bergstrom Dec. ¶¶ 9-10; App. Exs. 13-14.)  Despite being on vacation, he emailed a broker at Goldman Sachs' Swiss affiliate and directed the broker to call him. (Bergstrom Dec. ¶ 4; App. Ex. 7.)  Phone records for a cell phone registered to Rodrigo Terpins reflect four calls from a number associated with Goldman Sachs' Swiss affiliate on February 13, the day of the Heinz trade, including a nine-minute call. (Bergstrom Dec. ¶ 7; App. Ex. 12.) Correspondence from Goldman Sachs' Swiss affiliate to Alpine Swift also states that Rodrigo Terpins placed the Heinz trade at issue in the amended complaint and that the trade was placed over the phone.  (Bergstrom Dec. ¶ 4, App. Exs. 8-9.)  The broker cautioned Rodrigo Terpins that Goldman Sachs rated Heinz a "sell" when he placed the trade, but Rodrigo Terpins nevertheless instructed the broker to place the trade.  (Bergstrom Dec. ¶ 4, App. Ex. 6.)  Order tickets show that the Account began purchasing out-of-the-money Heinz call options shortly after the nine-minute call reflected in Rodrigo Terpins' phone records.  (Bergstrom Dec. ¶ 4; App. Ex. 5.)

## III.   DISCUSSION

### A.  The Proposed Consent Judgments are Fair, Adequate, Reasonable, and In the Public Interest

In reviewing a consent judgment, the district court's role is to determine whether the

---

action one day after the Announcement, and as a result did not take any investigative testimony. Moreover, the Commission entered into the proposed resolution of this matter prior to commencing deposition discovery and discovery from Rodrigo and Michel Terpins.  However, in connection with its investigation of this matter, Commission counsel has communicated with counsel for two witnesses – one located in the United States and one located in Brazil – who indicated that their clients are able to provide information concerning how the defendants obtained the nonpublic information.

proposed consent judgment is fair, adequate, reasonable, and in the public interest.  *See, e.g.,*

*SEC v. Citigroup Global Markets Inc.*, 673 F.3d 158,164-65 & n.1 (2d Cir. 2012); *SEC v. Wang*,

944 F.2d 80, 85 (2d Cir. 1991); *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).   In

assessing the public interest, a court must defer to the agency that is charged with making "an

assessment of how the public interest is best served."  *Citigroup*, 673 F.3d at 164.  In doing so,

the court's role is not to decide "whether the settlement is one which the court itself might have

fashioned, or considers as ideal."  *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st

Cir. 1990).  Deference is also important because an agency is best equipped "to deal with the

many variables involved in the proper ordering of its priorities."  *Heckler v. Chaney*, 470 U.S.

821, 831-32 (1985).  Agencies entering into settlements "must not only assess whether a

violation has occurred, but whether agency resources are best spent on this violation or another,

whether the agency is likely to succeed if it acts," and whether the certain benefits outweigh the

costs and risks posed by trial.  *Id.* at 831-32; *see also Citigroup*, 673 F.3d at 164 (*citing Heckler*,

470 U.S. at 831-32).

  The proposed consent judgments meet this standard because they provide for the type of

relief the Commission would likely obtain even if it prevailed on the merits in litigation, while

also taking into account litigation risks and the challenges involved in litigation against foreign

defendants.[5]  After several months of investigation and litigation, the parties, who are

represented by experienced counsel, engaged in arms' length negotiation and agreed to consent

---

[5] Litigating this action would be particularly complex because it involves multiple foreign jurisdictions, including Brazil, the Cayman Islands, and Switzerland.  The defendants are Brazilian citizens who reside in Brazil, Alpine Swift is a Cayman Islands entity with a Swiss trustee, and the account through which the trades occurred is a Swiss brokerage account serviced by a broker who resides in Switzerland.  Relevant witnesses and documents may be located in each of these jurisdictions which each have different legal regimes and information sharing agreements with the United States.

judgments that order injunctive relief against future violations of Section 10(b) and Rule 10b-5. Moreover, the consent judgments provide for significant monetary relief that is consistent with the applicable law.  They require full disgorgement of defendants' trading profits, which deprives defendants of all of their ill-gotten gains.  The $3 million civil penalty amount that defendants have agreed to pay is also within the range of penalties that the Commission could obtain in litigation under Section 21A(a)(2) of the Exchange Act.  *See* 15 U.S.C. § 78u-1(a)(2) (providing that the amount of penalty in an insider trading case "shall not exceed three times the profit gained or loss avoided as a result of [the] unlawful, purchase, sale, or communication"). The defendants' agreement to pay the $3 million penalty also eliminates the litigation risks associated with enforcing civil penalties abroad—even if the Commission were to prevail against defendants at trial, the Commission may face obstacles in enforcing a civil penalty judgment against the defendants who reside in Brazil.  *See, e.g.*, Lawrence Collins, *Professor Lowenfeld and the Enforcement of Foreign Public Law*, 42 N.Y.U. J. Int'l L. & Pol. 125, 125-29 (2009) (discussing the "almost universal principle" that the courts of a sovereign state will not enforce a "penal, revenue or other public law" of a foreign state and the application of this principle to the Exchange Act).

### B.  The Evidence Adduced Provides Additional Support for the Proposed Settlements

Although an evidentiary submission is not a prerequisite for approval of a consent judgment, the Commission has produced sufficient evidence to support the allegations in its amended complaint.  A person is liable for insider trading under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder when he obtains material, nonpublic information intended to be used only for a proper purpose and then misappropriates or otherwise misuses the information in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to

make "secret profits" by trading or tipping others.  *Dirks v. SEC*, 463 U.S. 646, 654 (1983).

Courts have repeatedly recognized that allegations of insider trading can be supported by

circumstantial evidence.  *See, e.g., SEC v. Singer*, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992)

(internal citation omitted) ("proof of insider trading can well be made through an inference from

circumstantial evidence and not solely upon a direct testimonial confession."); *SEC v. Roszak*,

495 F. Supp. 2d 875, 887 (N.D. Ill. 2007) ("direct evidence is rarely available in insider trading

cases, since usually the only witnesses to the exchange are the insider and the alleged tippee,

neither of whom are likely to admit liability.")

Evidence such as trading in suspicious amounts or at suspicious times is probative of

scienter.  *See SEC v. Scoppetoulo*, 2011 WL 294443, *3 (S.D. Fla. Jan. 27, 2011), *citing SEC v.

Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998); *see also, SEC v. Heider* 1990 WL 200673, *4

(S.D.N.Y. Dec. 4, 1990) (noting that the circumstances surrounding the defendants' purchases of

call options, including the dramatic increase in the volume of call options and that defendants

accounted for a sizable percentage of the increased trades, were sufficient to draw a strong

inference of scienter.)  In addition, evidence that defendants have an unusually high confidence

in the strength of their investments is suggestive of insider trading.  *SEC v. Musella*, 748 F. Supp.

1028, 1039 (S.D.N.Y. 1989) (reasoning that unusually large purchases of stock and options

inconsistent with prior trading history were suggestive of insider trading because they showed

that defendant had confidence that the investments would "pan out" quickly.)

The evidence set forth above supports the Commission's allegations.  First, the evidence

shows that the Announcement was material and nonpublic.  *SEC v. Mayhew*, 121 F.3d 44, 52 (2d

Cir. 1997) (noting the materiality of acquisition information).  The materiality of this information

is further buttressed by the increase of over 1,700% in the value of the Heinz call options at issue

11

here following the Announcement.  *See SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (materiality can be inferred from the effect of announcement on the stock price).  Second, the evidence also demonstrates that the trades were made under suspicious circumstances.  Indeed, the defendants' timely and lucrative trading was highly suspicious and indicative of trading done on the basis of material, nonpublic information.  After not trading Heinz securities in the Account for at least a year, defendants invested nearly $90,000 in risky options positions the day prior to the Announcement.  As a result of this well-timed trade, the defendants' Heinz position increased from approximately $90,000 to over $1.8 million, an increase of nearly 2,000%, in just one day.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court enter the proposed consent judgments.

Dated: Los Angeles, California
       January 30, 2014

/s/ Megan M. Bergstrom
Charles D. Riely
Megan M. Bergstrom
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0535
(323) 965-4564
RielyC@sec.gov
BergstromM@sec.gov

12

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the Plaintiff Securities and Exchange
Commission's Memorandum in Response to the Court's Request for an Evidentiary Submission;
Declaration of Megan M. Bergstrom in Support of Plaintiff Securities and Exchange
Commission's Memorandum in Response to the Court's Request for an Evidentiary Submission;
and Appendix of Exhibits in Support of Plaintiff Securities and Exchange Commission's
Memorandum in Response to the Court's Request for an Evidentiary Submission in the action
*Securities and Exchange Commission v. Michel Terpins, et al.*, 13 Civ. 1080 (JSR) via electronic
mail on counsel for the following parties on this 30th day of January, 2014:

| | |
|---|---|
| Stephen Kaufman, Esq.<br>Andrew Kaufman, Esq.<br>Stephen E. Kaufman PC<br>277 Park Avenue, 47th Floor<br>New York, NY 10172<br>Telephone: (212) 826-0820<br>skaufman@sekpc.com | Attorney for Defendant Rodrigo Terpins |
| Dwight Bostwick, Esq.<br>Zuckerman Spaeder LLP<br>1800 M Street, NW, Suite 1000<br>Washington, DC 20036<br>Telephone: (202) 778-1882<br>DBostwick@zuckerman.com | Attorney for Defendant Michel Terpins |
| Juan Morillo, Esq.<br>Quinn Emanuel Urguhart & Sullivan<br>1299 Pennsylvania Ave. NW,<br>Washington, DC 20001<br>Telephone: (202) 538-8000<br>juanmorillo@quinnemanuel.com | Attorney for Relief Defendant Alpine Swift<br>Ltd. |

/s/ Megan M. Bergstrom
Megan M. Bergstrom
Attorney for Plaintiff
Securities and Exchange Commission
5670 Wilshire Blvd, Suite 1100
Los Angeles, CA 90036
bergstromm@sec.gov